Case number 23-1954, Doretha Braziel et al. v. Gretchen Whitmer et al., argument not to exceed 15 minutes per side. Mr. Rehm, you may proceed for the appellants. Good morning, Your Honors. Thomas Rehm on behalf of the City of Benton Harbor, Mayor I'd like to reserve two minutes for rebuttal, please. We are asking that the district court's opinion be overruled and for this court to hold that defendants are entitled to qualified immunity. I'd like to discuss two things with you. First, the Guertin decision, and then second, I'd like to talk about the individual allegations or lack thereof. First, starting with Guertin. That case is readily distinguishable. As the magistrate judge said in this case, this is not Flint. In Guertin, there was a switch to a water source known to be 19 times more corrosive. It was known to be toxic. They switched to a mothballed treatment plant. There was no corrosion control. The defendants that were held to state claims knew it was unsafe, and they told people it was anyways. There was allegations that they even lied about corrosion control and safety measures. As the Guertin court held, the crisis was predictable and preventable. One thing that I think is really important in this case that the Guertin court said was that the Flint defendants made no contention that they provided notice to Flint residents about the lead-laced water. Wasn't there a contention here, though, that the defendants did not provide adequate notice about the lead in the pipes and what to do about the lead in the pipes? There's a contention. There's a statement they didn't provide enough, but, Your Honor, the substantive due process is a limitation on government action, not inaction. So to us, that's a failure to warn theory. Could they have done more? Could they have done more? Could they have done more? That's a failure to warn. The substantive due process clause, as interpreted by the courts, is a limitation on government action, not inaction. So what if there were misleading statements that all you needed to do was flush the water for one minute, when, in fact, everybody knew you needed to flush it for five minutes, hypothetically? Hypothetically, I don't. I think that's out of context, and I would like to talk about that in the context of the individual allegations. Hypothetically, I still don't think that's enough. You know, they say flushing, which is a common mechanism to get rid of lead, that's what the EPA recommends, that's what the CDC recommends. That, to me, is not enough to say this is conscious shocking behavior. It's a known cause of lead. Suppose, again, I realize I'm talking hypothetically, but arguably some of the facts are here. Suppose it was clearly known that the only way flushing would work would be if you did it for at least five minutes, and you had someone, like the water chief, saying, oh, all you need to do is run your water a little bit, one minute will be fine. If he said that and didn't act with deliberate indifference, I wouldn't say that would be a constitutional violation. It would just be negligence. It would just be negligence, Your Honor. It would just be negligence. So going back to the Gorton decision, distinguishing it here, you know, lead started leaching from our pipes because of historical use of lead pipes. There's no allegation that any defendant caused the contamination. There's no affirmative action to switch to a contaminated source. And plaintiff's own complaint details the public notice that was immediately provided. That's what distinguishes this case from Flint. Plaintiff's own complaint, if you look at ECF 71-5, details significant public health effects of lead, or health effects of lead. Plaintiff's complaint details how we engage the state, use corrosion control, and offers a to reduce lead exposure, including flushing the pipes. It's the exact opposite of what happened in Flint. And I want to talk about Defendant Werfel, who was mentioned in Gorton, and the District Court relied on, and plaintiffs rely on in their appeal. Defendant Werfel is very distinguishable from O'Malley and Muhammad here. For starters, in Gorton, the court linked Defendant Werfel with the MDEQ actors as a group. The MDEQ actors, the court said, were responsible for causing and then covering up, as a group, responsible for causing and then covering up the lead contamination. I listened to arguments from the Gorton decision in preparation for today, and counsel in that case even mentioned that the two groups that were listed as having caused the contamination were the MDEQ defendants and the Flint defendants. Defendant Werfel was part of that group as a whole. But even setting aside that he was only involved in making statements after the fact about the lead contamination in Flint, he is still readily distinguishable. This court said regarding Werfel that allegations against him were numerous and substantial. Repeat, numerous and substantial. He's mentioned in the complaint in Gorton 35 separate times. Judge Moore, your opinion in Wade detailed the allegations at page 329 of 330. You detailed the allegations that were made against Defendant Werfel, and they're distinguishable from the allegations that are made against O'Malley and Muhammad here. In your opinion, you noted that he was alleged to be instrumental in the cover-up. That in the summer of 2015, he repeatedly lied to the public and told them the Flint water was safe. He told people they can, quote, about claims of lead. He cited distorted water quality tests as evidence that there was no concern. And then he attacked two independent whistleblower reports by two doctors. We have nothing similar here. There's no allegations that O'Malley or Muhammad did anything. There's just conclusions that they repeatedly told somebody it was safe or that they covered up the crisis, arguably, not giving the residents enough information so that they could protect themselves. And why isn't there enough in the second amended complaint with respect to either O'Malley or Muhammad on that? Because, Your Honor, I agree that may be the crux of the complaint, but you can't just simply say they covered up the crisis. And one, it's also opposite of their pleadings, which clearly say, and they have exhibits that say, the public notice that was immediately provided in the water report in 2018, the public notice on the town hall that's going to be issued. So talking about a cover-up when they immediately told everybody is a little bit disingenuous. But even setting aside, you can't just say, are Iqbal and Twombly clearly required that they have to state facts on which we can make an assessment that there was a cover-up. But all they said here is there's a cover-up, Your Honor. They don't say, here's how they covered up. That was detailed in Gwerton. Here we just say there's a cover-up, there must be liability, there's a constitutional claim. We can't leap to that assertion. What this court said about Nick Lyon, I think bears repeating. This is really important. This is the crux of their claims against Mohamed and O'Malley. In footnote eight in Gwerton, the court detailed the claims against Nick Lyon. He was part of the MDHHS in Gwerton. He, quote, participated in, directed, and oversaw the department's efforts to save face, to observe and discredit the efforts of outside researchers. Continuing, Lyon knew as early as 2014 of problems with lead and Legionella contamination in Flint's water. Instead of fulfilling his duty to protect and notify the public, he participated in hiding this information. The Gwerton court held, this is precisely the type of comirical, bare assertion that Iqbal requires we set aside. The result is no different here. They've said there's a cover-up, they've said they hid information, therefore this data claim. The court didn't allow that in Gwerton and they shouldn't allow it here. I'd like to turn a little bit to two pieces of evidence that are relied on here because I think that it merits what is going on and the information that was provided as distinguished from Gwerton. We talk about how in our brief and in the district court held, there's a lot of conclusory allegations about exasperating, maintaining, covering up the crisis. That's not enough to state a claim. Plaintiffs recognize that, the district court recognizes that. Now in their brief for the first time, they start talking about two pieces of evidence that weren't really talked about in their complaint, but they're talked about on appeal. Yes, they were attached to the complaint, but they were not pled necessarily or any implications from them. In their brief, they cite two pieces of evidence. The first is Exhibit E, the plaintiff's second amended complaint, ECF 71-5, starting on page ID 924. This is a statement, the water quality report, which is attributed to Michael O'Malley. And plaintiffs argue in their brief that O'Malley contained, quote, false statements and made false recommendations and provided a false sense that the water was safe. Their quotations and their statements are grossly distorted, even looking at the document itself. For starters, this is 2018. This is the outset of a crisis. The document they're referring to as statements that were made talks about, in 2018, talks about lead testing, the lead exceedance that just occurred, public notices that need to be issued and were issued. It talks about additional testing and then, contrary to their claims, provides an abundance of information about the harmful effects of lead. This is the statement they rely on. This is a quote, page ID 929. If present, elevated levels of lead can cause serious health problems, especially for pregnant women and young children. Page 930, infants and children who drink water containing lead could experience delays in their physical or mental development. It goes on. Page 936. Excuse me, counsel. Yes. Could you address, I mean, we have evidence in the record here that Mr. O'Malley falsified documents, falsified documents about the, from the water department and maybe was fired for it. How does that not give, get us to the plausibility level with, with an idea of a cover-up? The idea that he falsified documents, the allegation from memory, is not that he falsified any documents pertaining to lead. There was falsified reports, I believe the allegation, and I'll check when I sit back down, pertain to something submitted to the state had nothing to do with the lead or the lead contamination or any public notice required to be by the lead contamination. I don't think that any action or the allegation there, and I don't believe it's mentioned in their, in their briefing at all, pertains to any type of deliberate indifference or conscious shocking behavior of him. So if it were not related to lead, if that's the case, then are you saying we should ignore the fact that he did apparently falsify documents with some other topic? I mean, based on their pleadings alone, I don't think they're, they're connected. It's just a fun fact that they found. But going back to the, the public notices that they do rely on, and we're talking about, again, going back to Exhibit 71-5 in the record, there's an abundance of information about the health effects of lead that's provided at the outset of 2019. You know, lead can cause serious health problems. This is not hiding information, this is providing information. So you're specifically talking about Exhibit E, and it is a very lengthy document. Yes, Your Honor. You've given us some page numbers. Does that protect O'Malley then from any later liability, any later actions that he might have taken to dissuade residents from attending to their needs vis-a-vis the lead crisis? Certainly, Your Honor. I don't think that that document insulates him from his further actions, but the problem we have here is this is the only allegation they have about statements that were made. They have nothing but conclusions from thereafter about statements. If you look at their briefing here, they say he falsified information. He gave people a false sense of security. Look here, look here. Then they cite back to their brief. But this is the document they cite. And there's no plausible inference from this document that says, lead is bad, be careful. There is no way we can draw a plausible inference that this is conscious shocking behavior. This is good government. There's a problem. We're letting you know about it. There's health effects. It also provides ways to reduce your exposure to lead in this document, which talks about using bottled water or using filters. I don't know what more you could want from your government. Could they solve the problem immediately? No, they couldn't. It's a community with limited resources. Okay, so my understanding was that their contention is that there were other statements by O'Malley and Muhammad other than this Exhibit E. Yes, Your Honor. And I'd like to touch on that briefly because the only thing that plaintiffs say in their complaint, if you look at paragraph 205 of their complaint, if you look at the complaint that's made about Muhammad, and I forget the paragraph reference off the top of my head, their conclusory allegations that from 2018 to 2021, they made some statement, some statement about safety. What was the statement? Who was it made to? How can we as a court, how can we even begin to understand, without knowing what the statement is, who it was made to, where it was made, the context it was made, how could we even begin to understand whether the statement was made with deliberate indifference, whether it was conscious jacking? Yeah, but 205 is arguably a conclusion paragraph because it says, although the water supply was unsafe to ingest, Defendant O'Malley repeatedly denied, repeatedly denied, lied, and covered up this public health emergency. Yes, Your Honor, and we agree it's a conclusion. That doesn't state a claim under this court's case law, under Twomley, under Iqbal. You can't just say we repeatedly lied to the public for a period of three years. When did we lie? Who did we lie to? How could we make the assessment that the statement, like the court did in Gorton, we had very specific statements. Some were allowed to stay, were full. Some were not, lying. And conclusions that this court made in Gorton, conclusory allegations, like made against Nick Lyon in Gorton, are the same ones as we have here, and that's why this case should be dismissed. Just as we're getting into concrete statements, can you address the statements in paragraph 106 of their complaint, of the second amended complaint? No, I don't expect you to have it, but this is Mr. O'Malley, and it's a quote here saying that that the water after the quote first flush, it was okay to drink and cook the tap water because quote the water supply, they provided clean water right to their spout. Can I address it? Please. If the allegation was made, I mean it's a very common, the EPA recommends flushing water. That is not a statement, one off statement at the outset of the crisis, does not suggest deliberate indifference or unconscious shacking behavior. The federal government recommends various... And if Mr. O'Malley knew that this was not safe to drink after the first flush, and that they were not providing clean water right to their spout, is that a problem? It's not a problem because it doesn't suggest conscious shacking behavior or deliberate indifference. Thank you. Have your rebuttal. Thank you. Good morning, your honors. Mark Chalice on behalf of the community members in Benton Harbor, Michigan. I want to just take a step back. We represent the named plaintiffs, and this is a proposed class action. The named plaintiffs are principally moms, grandmothers filing this case on behalf of their children, their grandchildren. Benton Harbor's community in western Michigan, it's a beautiful area. It's been hit hard by the loss of manufacturing jobs. The city population is approximately 85% African American. 27% of its residents are children. The water system is owned and operated by the defendant, City of Benton Harbor. The residents had no choice but to receive their water from the Benton Harbor system. In 2018, the testing of the Benton Harbor water system found that it was contaminated by massive amounts of lead, many times above the actionable levels issued by the government, in higher concentrations, and more frequently violating those levels than in the Flint case. One of the named plaintiffs, Ms. Barzil, her water tested with a concentration of lead at 889 parts per billion, nearly 60 times the allowable levels. The time of their minor children or infant grandchild who drank formula made with the Benton Harbor water. Like Flint, the Benton Harbor water crisis has created persistent harms. I think the defendants will agree that as a first principle, no amount of lead exposure is safe, particularly for children. The effects of lead poisoning in children are catastrophic and they're irreversible. But the crux of the problem here is how detailed was or should your complaint have been to show that O'Malley and Muhammad, who are the two individuals in front of us, violated substantive due process rights? That's right, and this court has given us guidance on that in a number of other instances. The Courtright case, Courtright v. City of Battle Creek, 839 F. 3rd 513, decided in 2016 and said very plainly, no heightened pleading requirement applies to our review of a motion to dismiss based on qualified immunity. All inferences must be drawn in favor of the plaintiff and the typical 12B standard. There is no 9B particularity requirement. Mr. Ream said, the who, what, where, when, that's 9B language. Are you allowed, looking at 205 as the sort of summary, you say that defendant O'Malley repeatedly denied, lied, and covered up this public health emergency by repeatedly telling Benton Harbor residents and the public that the water was safe to drink. So where do we find in your complaint some examples of those repeated denials, lies, and cover-ups? Well, with respect to Mr. O'Malley, there is in paragraph, I believe it's 106, a specific statement that he made, that your honors have pointed out, where he said that first flush it was okay to drink and cook, and they provide, they Benton Harbor, provide clean water right to the spout. That was something in 2019 that he, as director of the water department, knew was absolutely false. Okay, so and Judge Blumkatz had pointed that out earlier, and that is one statement to one person, Izzy Mera, that he made, that O'Malley made. Is there anything else in the complaint that you would point us to? In terms of the who, what, where, and when, no, there's not, your honor. That is, and I'd submit, not our burden on the complaint, on the initial complaint. I think that's... Well, why isn't it conclusory to say in 205 that he repeatedly denied, lied, and covered up, if you only can point to one? Right, well, there's only one detailed in the complaint, that is true. The allegation is that he did do this repeatedly. We don't, we didn't list out, you know, the time, place, who heard each one of them, and same with Mayor Muhammad. We didn't list that in the complaint, and I would submit that under court right, that's sufficient to get us past the motion to dismiss. There'll be a time when we have to specify all of those, and we will. That's going to be after discovery. We have to find out what the, you know, we haven't had a chance to depose them. We haven't seen any of their internal documents. You still have to plead some facts. Right. I don't, okay, so you're saying O'Malley is basically 106 and 205, and I, you agree that's, I mean, not even close to what the allegations were against Werfel? I don't agree that it's, it's not even close to what the allegations of Werfel were. Werfel, there are principally two statements that were attributed to Werfel in that case. It was a radio interview he gave, and then an unknown, unspecified communication that he made where he said residents can relax, don't need to worry. So those weren't in that complaint. They were not specified who heard it, you know, the who, what, when, where, and when of those. The point is that he repeatedly, and in Werfel, in Wade, the court says Werfel repeatedly lied, and cites essentially two sort of vague statements that he made without the who, what, when, and where. If it were a 9B case, if this were required to be pleaded with particularity, then I think we'd have an issue. I think at this stage, given there's been absolutely no discovery, and we're at the very beginning of the case, we have plausibly pleaded that these two men, as the mayor and director of the city water department, knew what they were saying was wrong. What did the mayor say? So the mayor said, the mayor reassured a number of people that the water was safe to drink. That's in paragraph 107, where he repeatedly said the same thing. He told the public and the Benton Harbor water supply users and each plaintiff that the tap water was safe to drink. Is there any other statement that you would point us to in your complaint that would give further support vis-a-vis? Paragraph 26. From 2018 through 2021, Defendant Muhammad approved of, participated in decisions, and covered up the Benton Harbor water crisis. So as you understand, counsel, we're looking at statements. There's what these defendants told the public. I think your friend on the other side has said, well, it's not just about the statements. They have to be made with some sort of level of mens rea, with deliberate indifference, with knowing that they're false, knowing that if they're telling people to flush the water, they need to know that that is actually not a viable solution. In terms of your complaint, are you just allowed to say, well, they lied about that? They knew that that wasn't good enough. Do you need to put a little bit more meat on those bones before it hits plausibility? Well, we have alleged that they knew that these statements were not true. And I think context is important here, particularly when drawing the inferences in favor of the plaintiffs, as the court must do. This is occurring in 2018. The Flint water crisis had been going on for three years at this point. It was in the national news. This doesn't happen in a vacuum, and it's not the first time a municipality is facing a water crisis. They knew the problems with lead. They knew that lead was incredibly dangerous, especially for children. And they knew that flushing is not sufficient to make it safe. At that point, it had been certainly known in the government official community that that was the case. Separately, the EPA was involved. The state was involved. They were having ongoing discussions. Now, we don't have the benefit of all those internal emails. We have a little bit from the state side, but that's it. They knew very well the danger they were putting this community in, and we've pleaded that. Do we have the who, what, when, and where of what they knew exactly? No, we don't have their internal documents yet. We don't have... Presumably based on their positions, being the mayor, being the superintendent, they would have been privy to all of this information. Yes, ma'am. And that's what we've pleaded. And again, I think this is sort of the crux of this pleading standard issue. The court right case, I think, makes clear what the standard is. But what I heard my colleague say up here is a very nice set of inferences in favor of the defendants. This is good government, I think he said. And he lays out these facts as being very reasonable conduct. Well, that may be one construction of what happened. I don't think it is, but it may be. What at this stage, at the motion to dismiss stage, the charge of this court and the charge of the district court, which she did, she threw out a lot of claims against a lot of defendants, not these two, is to read the complaint in its entirety, read it in the context, and read it as a whole, which is what court right tells us, and draw those inferences in favor of the plaintiff. Now, there may come a time where we're back here on a summary judgment motion, for example, at which point we may not get the benefit of that. But at that point, we will have the discovery and the factual context of all of our statements will be much more clear. Has there been any discovery in this case? No, ma'am. I'm curious about Exhibit E that your opponent has pointed us to. Is there anything in Exhibit E that supports your position that O'Malley was lying or misleading? Well, in Exhibit E, yes, the answer is yes. He says I'm on page six of the document. I don't know the page ID number. It's 929, I think, of the page ID. Okay. He says on the information about lead, for example, he says when your water has been sitting for several hours, you could minimize the potential for lead exposure by flushing your tap for 30 seconds to two minutes before using the water for drinking or cooking, for example. At that time in 2019, Mr. O'Malley and Mr. Muhammad knew very well that given the levels that had been tested in Benton Harbor, which we've outlined, including 60 times the allowable limit, no amount of flushing would make it safe. He, before that, suggests that the problem is that the lead in the drinking water is primarily from materials and components associated with service lines and home plumbing. That's not true. What he's suggesting there, that the problem is, and he goes on to say Benton Harbor can't control the variety of materials used in plumbing components. What he's saying is basically it's you, residents, your fault. It's your lines that come in your house, it's your faucets in your house that are causing the lead. That may be a contributor, but there was lead coming from the Benton Harbor water supply. So that's not a true statement. But the overall gist of this document, which is consistent with many of the statements that both the mayor and O'Malley made, is that it's safe to drink this water. It was not safe to drink the water. I thought it was coming from the water supply. Where was it coming from? Because I thought the water supply was coming from Lake Michigan, and Lake Michigan doesn't have lead. Am I missing something here? No, you're almost there. The lake doesn't have lead. The lead is in the Benton Harbor pipes. What he's suggesting is it's not in our mains. It's not coming from us. It's coming from the pipe that goes from the street to your house and then your faucet. Okay, the service line goes from the street to the house. Yes, ma'am. And you're saying the lead, or at least some of it, pre-existed the service line. That's right. And so he is misleading there. Yeah, that's right. Right, because the notion is if it's in your, what he's suggesting, is if it's in your service lines, in your faucets, you run your tap long enough, there will be no more leaded water coming through. But that's only true, maybe, if there's no lead coming from the mains, which there was. And he's all over the map. At some point, he sort of suggests that. But the point is, he's the director of the water department, and this is the mayor of a city. Remember, in 2018, three years after Flint, it is all over the news, saying, no, no, it's okay, you can drink the water if you do these few things. Both of them have also said use filters. If I could interrupt, sorry. With respect to the mayor, what did he do more than just try to reassure the citizenry that this was not an urgent, life-threatening problem? Did he do more than that? We believe he did. He didn't just reassure them, he lied to them, first of all, is what we've pleaded here. Secondly, the water, the amount of lead in the water in Benton Harbor, we pleaded this in the complaint, went up from 2018 to 2021. The city contracted with an outside vendor and worked with the outside vendor to do a corrosion control program, which they recklessly botched. And as a result, the amount of lead went up. Mayor Muhammad, as the chief executive officer of the city, was involved in that process, as was Mr. O'Malley, as the director of the water. Now, they fired Mr. O'Malley after all this. But in any event, they made the water worse. They added lead. More lead is more danger. And that happened after 2018. How did they do this? It was a botched corrosion control. They're essentially using the wrong chemical. And that's subject of claims in a separate lawsuit against the outside companies that they hired. But the city was involved. The city contracted with this outside company. It may have been that the state had a role in selecting the company, but this was a cooperative program. And that's in our complaint as well. It's in one of the attachments to the complaint where there's an Exhibit D where it clearly says the city and the engineering company designed the corrosion control program. Thank you. Your red light is on. Thank you very much. Thank you. Thank you. Just to talk about paragraph 106 a little bit more. Again, as the district court found, it's a single statement to Izzy Mara. She's not even a named plaintiff. There's no allegation that any plaintiff relied on it or even heard it. How could we reference that as plausible inference against O'Malley or Mohamed here against plaintiffs? Again, all we have here is a statement that for three years some statements were made against safety, but the plaintiffs give us no opportunity to assess what those statements were. Just that some statement was made over a period of three years. Exhibit E to Plaintiff's Complaint, Record ID 71-5. It talks about the significant health effects of lead. Plaintiffs quote out of context a citation to an EPA standard about flushing lines if they're sitting for a long period of time, which is a very common mechanism to reduce lead. It doesn't remove it completely, but it doesn't say that either. It's an EPA standard. The document speaks for itself and in context. There's no plausible inference that anybody was indifferent to anybody's safety here. Speaking of conscious shocking behavior, constitutional repugnant behavior, the case law is very clear on this. It's truly conscious shocking. It's Washington versus Harper. It's the forcible injection of medication. It's in recent Cincinnati radiation litigation, exposing people unknowingly to nuclear war levels of radiation. Can I ask you a question? Sorry, it's about the record. The press releases, can they be attributed to the mayor? Well, it's funny that you mentioned that. I mean, I don't think it's a fair inference. If you actually look at their complaint, they say it in their brief, but if you actually look at their complaint when they talk about that, and I think this is what controls their allegations, I have it here. Plaintiffs allege in the Second Amendment complaint, paragraph 53, that the press release was drafted by EGLE and MDHHS. It's not drafted by Muhammad. It's also unsigned. Okay, but even taking the press release, this is the outset, even let's say it was Muhammad, and they don't allege that it is. Now they're doing their brief on appeal, but if you look at that press release at January 23rd, 2019, the city just had a lead crisis. This is announcing, it's a joint press release with the health department. Come, come to the town hall meeting, learn about lead. There is a problem here. This is the outset of the crisis. There's a problem. We need to tell you about it. Further testing is required. It was. The federal regime gives us 12 months to come up with a plan. So to say that this is, that press release that hey, we had a lead exceedance, this is serious, there's ways to mitigate your risk, come learn more, and then have a town hall set up a hotline, to say that this is constitutionally repugnant behavior, I don't know what more you would want from your government official. How can you make a plausible inference that this is constitutionally repugnant, that this is injecting poison into somebody. This is notice. That's the difference between Girton here. At best, plaintiffs have stated a negligence claim. Your red light is on too. Okay. I just want to say, at best, they've stated a negligence claim. That claim is pending in the Berrien County Circuit Court and should be adjudicated there, not under the federal constitution. Thank you, your honors. Thank you both for your argument and the case will be submitted.